FILED

2008 Mar-31  AM 09:08
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DENISE S. BRUNSON and }
MICHELLE P. RONK, }
 }
  Plaintiffs, }
 }
v. }
 }          CIVIL ACTION NO.
NARROWS HEALTH & WELLNESS }    2:06-CV-1148-AR
LLC, }
 }
  Defendant. }
 }
 }
 }
 }

**<u>MEMORANDUM OPINION</u>**

Plaintiffs Michelle Ronk ("Ronk") and Denise Brunson ("Brunson") filed the above-styled action under seal individually and as relators on behalf of the United States against defendant, Narrows Health and Wellness, LLC ("Narrows"), on June 19, 2006. On August 3, 2006, the United States elected not to intervene, and the action proceeded with Ronk and Brunson not only as relators but with individual claims for retaliatory discharge. In an opinion entered on January 4, 2007, the court dismissed with prejudice the plaintiffs' qui tam claim under the False Claims Act ("FCA") but permitted them to proceed on their individual claims of retaliation under the FCA. The court now has before it the motion for summary judgment of Narrows on the retaliation claims. In addition, Narrows has moved to strike portions of plaintiffs' evidence

1

submitted in opposition to the motion for summary judgment.  For the reasons that follow, the court will grant in full Narrows's motion for summary judgment, rendering moot the motion to strike.

**FACTS**[1]

Narrows is an Alabama limited liability company operating as an urgent and family medical care facility located in Shelby County, Alabama.  It is owned by three doctors, E. Payson Daugherty, D.O. ("Daugherty"), Jerry Hankins, M.D. ("Hankins"), and David Pavlakovic, M.D. ("Pavlakovic").  Daugherty is the managing member of the LLC.  In April 2003, Brunson was hired to work as the lead employee in Narrows's billing department.  Ronk became Narrows's practice manager in August 2003 and was responsible for the practice's billing and collection.  In their respective positions, Brunson reported to Ronk, and Ronk reported directly to the doctors.

Narrows primarily operates by billing insurance providers for the services rendered by its physicians.  The great majority of these insurance providers are privately owned; however, a small percentage (between six and fifteen percent) of the services provided are ultimately billed to the federal government through the Medicare program.  The billing process is governed by a series of codes developed by the American Medical Association ("AMA").

---

[1]     In accordance with Fed. R. Civ. P. 56(c), the narrative statement includes facts that are undisputed by the parties, and where there is a dispute, the facts are presented in the light most favorable to Ronk and Brunson, the non-moving parties.

The Current Procedural Terminology ("CPT") codes governing the services provided by Narrows are known as Evaluation and Management ("E&M") codes.  For each type of service provided to patients, there is a corresponding code, which is determined by the intricacy of the doctor's examination, the extent of the patient's history gleaned from the doctor-patient interaction, and the complexity of the diagnosis made.  Codes corresponding to more extensive, intricate, and complex visits render a higher dollar amount of compensation to the physician from the payor, whether it be a private insurance company or the Medicare agency.

During the majority of Ronk's and Brunson's employment with Narrows, the physicians would make notations on patients' charts outlining what occurred during patient visits.  The doctors would also include a code at the bottom of the chart indicating what billing level the visit should be coded for.  Brunson and the rest of the billing department would receive these charts and note the initial billing code designation but would ultimately code and bill based on their own review of the chart's documentation of the visits and the official coding requirements and categorizations.

In 2005, Daugherty became concerned about the profitability of the practice and concluded that the lower than acceptable revenue could be attributed to the billing department's practice of not submitting codes for compensation at rates equivalent to the services the doctors claimed to have provided.  In November 2005,

Daugherty requested that Ronk develop a new billing system to be governed by a superbill. A superbill enables doctors personally to check boxes identifying medical services provided in patient visits. These boxes correspond to billing codes that would be directly entered by the practice's billing department. Superbills are quite common as billing devices and are standard in the medical industry.

Ronk and Brunson worked together in creating several superbill drafts. Ronk submitted an initial draft of the superbill to Daugherty on January 11, 2006. Ronk contacted Wes Brown ("Brown"), an independent accountant serving Narrows, and informed him of the new billing procedure. Ronk submitted another draft of the superbill on January 12, 2006, reflecting changes and suggestions from Daugherty. On February 2, 2006, Thalia Baker ("Baker"), another independent accountant serving Narrows, performed an audit on Narrows's billing procedures, including the proposed superbill. Baker informed Ronk that Narrows's procedures, including the superbill, appeared to be satisfactory.

The billing policy accompanying the superbill provided that the billing department was to code the exact designations made by the doctors on the superbills. The written policy instructed billers to put claims on hold if they were unsure if the contents of the visit supported the level of coding designated by the doctors. The biller was to then forward the questionable claim to

4

Brunson, whereupon Brunson would communicate with the relevant doctors and nurses to ensure that the coding for the visit and services was correct.  The policy also provided that Ronk should consult with the doctors and nurses to ensure complete documentation for a correct billing.  Although the written policy provided for communication within the practice, it mandated that the doctors have the final say in code designation for billing purposes.  Ronk claims that despite this written policy, Daugherty instructed her that the billing process was to be strictly executed according to the doctors' designations on the superbill without the billing department's questioning the doctors and nurses regarding adequate documentation of the contents of the visit.

In late 2005, when Daugherty reached the conclusion that Narrows was not achieving his desired profitability rate and requested Ronk to implement a new billing system, conflict began to erupt at Narrows.  Ronk and Daugherty began to have disputes regarding the proper coding of services provided by the doctors and the extent of control that the doctors would have over coding and billing.  Ronk met with Daugherty and the other physicians to remind them that they had to follow the CPT codes established by the AMA for billing and that their charts needed to reflect documentation that supported the code for which they were billing. She also informed Daugherty specifically that he was billing incorrectly.  Because Ronk was concerned that the doctors were not

abiding by the applicable guidelines for billing, she consulted with Brown, Narrows's accountant, and let him know that she believed that the doctors' failing to comply with the standards was fraud. Brown, however, informed her that the Narrows doctors' billing practices were "fine."

Brunson, as the head of the billing department, also communicated with the doctors regarding billing requirements. She informed them that if their charts did not document that they had performed certain procedures, then, for billing purposes, they were deemed unperformed. Brunson pointed out that some of the claims they had submitted were for undocumented procedures and consultations. Brunson told the doctors specifically that if these undocumented and thus "unperformed" procedures were coded and subsequently billed for, the resulting claim was illegally submitted and was fraudulent. Brunson also told Daugherty that modifying a patient's chart without seeing the patient was fraudulent.

In early 2006, when Narrows was making the transition to the superbill, Ronk and Daugherty had problems agreeing on a billing system and how the authority to code claims was going to operate. Daugherty asserted that, under Ronk's authority, Narrows was under-billing for procedures and examinations that the billing department believed were not supported by the doctors' documentation. Daugherty also claimed that Ronk had cost the practice a large sum

6

of money.  In a meeting with Daugherty in February 2006, Ronk told
him that she believed they were suffering from a communication
breakdown and asked that he stop telling people that she was
costing the practice money.  Ronk expressed her unhappiness with
working at Narrows.  It is disputed as to whether Ronk thereupon
sought to resign.  After this meeting, Daugherty met with the other
doctors, and based on Ronk's unhappiness and their perception of
the practice's poor fiscal performance under her leadership, they
decided that Ronk should be terminated.  On February 6, 2006,
Daugherty called Ronk and effectively ended her employment.

After Ronk left Narrows, Brunson took over some of her
practice management duties and continued to work in the billing
department submitting claims.  In early March 2006, Brunson took a
test to become a certified coder.  In early April 2006, Brunson
found out that she had passed the test and had become a
Professional Coder, certified by the American Association of
Professional Coders and recognized by the American Medical
Association.  Brunson asserts that any liability attributable to
doctors who submit fraudulent medical claims to insurance providers
(private or public) can also be attributed to the billing staff
responsible for coding the claims if the staff member is certified
as a Professional Coder.  On April 9, 2006, Brunson submitted her
resignation to Narrows by taping a resignation letter on
Daugherty's computer screen.  She did not give retaliatory conduct

by Narrows as a reason and did not mention the FCA or her alleged
exposure to liability for fraudulent billing.

Prior to their departures, neither Ronk nor Brunson threatened
any FCA action.  They did not lodge complaints regarding Narrows's
billing practices with any outside authority nor did they inform
any personnel at Narrows that they intended to report the doctors'
alleged fraudulent conduct outside the practice.  Neither Ronk nor
Brunson contemplated the filing of an FCA action at the time they
left Narrows.  The qui tam case was not filed until over two months
after the last plaintiff had departed.

## DISCUSSION

The FCA, in addition to providing a private right of action as
a vehicle to expose and recover false claims submitted to the
United States government, provides whistleblower protection for
employees who attempt to expose fraud on the government and who
suffer adverse employment action as a result.  Specifically, the
FCA provides:

> Any employee who is discharged, demoted, suspended,
> threatened, harassed, or in any other manner
> discriminated against in the terms and conditions of
> employment by his or her employer because of lawful acts
> done by the employee on behalf of the employee or others
> in furtherance of an action under this section [the False
> Claims Act], including investigation for, initiation of,
> testimony for, or assistance in an action filed or to be
> filed under this section, shall be entitled to all relief
> necessary to make the employee whole.

31 U.S.C. § 3730(h).  The Eleventh Circuit has interpreted this
statute and has mandated that "[p]rotection under this provision

requires a showing that [the employee] was engaged in protected conduct and that [the employer] retaliated against him because of that protected conduct." *Mack v. Augusta-Richmond County, Georgia*, 148 Fed. Appx. 894, 896-97 (11th Cir. 2005). *See also Childree v. UAP/GA AG Chem, Inc.*, 92 F.3d 1140, 1144-46 (11th Cir. 1996); *Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1313 (M.D. Ala. 1999).

In outlining what is required in an FCA retaliation claim, other circuits have explicitly required what is implicitly stated in the Eleventh Circuit's articulation of FCA retaliation law, i.e., that plaintiffs must show that the employer knew about the protected conduct at issue at the time of the adverse employment action. *See, e.g., Maturi v. McLaughlin Research Corp.*, 413 F.3d 166, 172 (1st Cir. 2005); *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 944 (7th Cir. 2002); *McKenzie v. BellSouth Telecomms.*, 219 F.3d 508, 514 (6th Cir. 2000). Courts explicitly requiring this element have observed that a demonstration of an employer's knowledge of the employee's protected actions is essential to establish the retaliatory intent necessary to implicate the statutory protection. *See, e.g., Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 n.7 (3d Cir. 2001)*; Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951-52 (5th Cir. 1994). The Eleventh Circuit has inserted this knowledge requirement into its definition of protected conduct, requiring

9

that for a plaintiff's conduct to be protected under the FCA, the conduct must have put the employer on notice that the filing of an FCA suit was a "distinct possibility." *See Mack*, 148 Fed. Appx. at 897; *Childree*, 92 F.3d at 1146; *Mann*, 49 F. Supp. 2d at 1314 (defining the "distinct possibility" of an FCA suit as whether the employer reasonably "feared that the employee was contemplating taking legal action under the FCA or reporting fraud to the government"). Thus, in establishing an FCA retaliation claim, a plaintiff must demonstrate (1) that he engaged in protected conduct that led the employer to believe that legal action under the FCA was a "distinct possibility"; (2) that he suffered an adverse employment action; and (3) that there was a causal connection or nexus between the protected conduct and the adverse employment action.

### Michelle Ronk

Narrows argues that there is no genuine issue of material fact as to whether Ronk fulfills all the elements of an FCA retaliation claim. While Narrows has conceded that Ronk was fired, it argues that she does not make out the other components of her claim. It is unnecessary to reach the issue of whether there was a causal connection between Ronk's actions and her termination because Ronk is unable to demonstrate that her actions on the job were protected conduct within the meaning of the FCA and thus is unable to establish an FCA retaliation claim.

While it is clear that Ronk did alert her employers to her concerns about the billing process at Narrows, the activity that she undertook does not rise to the level of protected conduct under the FCA.  Specifically, Ronk asserts that she met with the Narrows physicians and instructed them on the correct way to code their claims, that she reminded them that they were bound to follow the coding guidelines, that she specifically told Daugherty that he was billing incorrectly, that she consulted with Narrows's accountant regarding her belief that failing to comply with the coding guidelines was fraudulent, and that she opposed Narrows's moving to a system in which she and the rest of the billing staff could not alter a code designated by a doctor before the claim was submitted for payment.  Although Ronk made it clear to the doctors at Narrows that she insisted on adherence to the coding guidelines and that she was not comfortable with the submission of claims with codes that she believed to be higher than what the treatment rendered called for, Ronk's conduct did not rise to the level of protected conduct within the meaning of the FCA.

Courts addressing this issue have made clear that protected conduct is conduct that puts employers on notice that it is distinctly possible that an FCA action will be filed as a result of an employee's investigation into claims made to and payments made by the United States.  *See Mann*, 49 F. Supp. 2d at 1314.  The court in *Mann* articulated this standard, observing that the question of

whether an employee's actions constitute protected conduct depends on:

> Whether the employee engaged in conduct from which a fact-finder could reasonably conclude that the employer could have feared that the employee was contemplating filing a qui-tam action against it or reporting the employer to the government for fraud... the court will look for evidence that the plaintiff, either by words or actions, communicated to the employer that she believed the employer had engaged in illegal or fraudulent conduct involving submission of claims for payment to the government.

*Id.  See also McKenzie*, 219 F.3d at 516 ("In order to defeat summary judgment [plaintiff] must raise a genuine issue of material fact that she engaged in 'protected activity,' defined as that activity which reasonably could lead to a viable FCA action... activity with a nexus to a *qui tam* action, or fraud against the United States government."); *United States, ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 743 (D.C. Cir. 1998) ("[A] plaintiff still must show that his employer was aware of his protected activity.  Merely grumbling to the employer about job dissatisfaction or regulatory violations does not satisfy the requirement–just as it does not constitute protected activity in the first place.").  Although Ronk communicated to her employers and to an accountant for Narrows that she believed some of Narrows's coding and billing of claims did not comply with coding requirements, she did nothing and said nothing to make clear to the doctors that any of their coding errors constituted fraud on the United States, nor did she make an effort to go outside the scope

of her employment or beyond her mandated role of enforcing appropriate billing standards.

As the practice manager for Narrows, Ronk oversaw the practice's billing and collection and directly managed Brunson, the head of the billing department.  Thus, it was within the scope of her employment to ensure that Narrows complied with all billing and coding guidelines set out by the AMA.  Not complying with the AMA guidelines and violating the FCA are not exactly the same thing. Because it was a part of Ronk's job to alert her employers to the fact that she believed some procedures were being coded and billed incorrectly, she  bears a higher burden in her obligation to demonstrate that she engaged in protected conduct.  Courts in the Eleventh Circuit have cited to this requirement.  *See, e.g., Mack*, 148 Fed. Appx. at 897 (citing the existence of a higher burden in the First and Fourth Circuits); *Mack v. Augusta-Richmond County, Georgia*, 365 F. Supp. 2d 1362, 1379-80 (S.D. Ga. 2005) (finding that an employee's reporting to employers about an organization's suspected noncompliance with federal regulations does not amount to FCA protected conduct because such reporting was a part of the employee's job).

Other circuits have required that employees who are charged with ensuring compliance with standards and regulations affecting claims to the government as a part of their job must be explicit in alerting their employer that some sort of qui tam or government

13

investigation is imminent in order to come within the scope of the FCA's protection against retaliation. *See, e.g., Maturi*, 413 F.3d at 173 ("[W]here an employee's job responsibilities involve overseeing government billings or payments, his burden of proving that his employer was on notice that he was engaged in protected conduct should be heightened."); *Brandon*, 277 F.3d at 944-45; *Hutchins*, 253 F.3d at 191 ("[W]here an employee's job duties involve investigating and reporting fraud, the employee's burden of proving he engaged in 'protected conduct' and put his employer on notice of the 'distinct possibility' of False Claims Act litigation is heightened."); *Eberhardt v. Integrated Design & Constr, Inc.*, 167 F.3d 861, 868 (4th Cir. 1999)("[I]f an employee is assigned the task of investigating fraud within the company, courts have held that the employee must make it clear that the employee's actions go beyond the assigned task."); *United States ex rel Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 (10th Cir. 1996); *Robertson*, 32 F.3d at 951-52.

In *Brandon v. Anesthesia and Pain Management Associates, Ltd.*, 277 F.3d 936, 938 (7th Cir. 2002), the plaintiff was an associate physician with a group of doctors providing anesthesia services to hospital patients, a large percentage of whom were Medicare recipients. The plaintiff became concerned that the shareholder doctors were falsifying billing reports to obtain higher reimbursement rates, similar to the concerns of Ronk and Brunson.

14

*Id.* at 939.   The plaintiff took action regarding his concerns, including contacting Medicare to investigate its exact regulatory requirements, bringing his concerns to the attention of the other doctors on a regular basis, and alerting them to the proper regulations and procedures they should have been adhering to.   *Id.* After the plaintiff showed persistence in pointing out the billing fraud to his employers, they began to indicate that they intended to terminate him and later notified him that he would be terminated in a few months.   *Id.* at 939-40.   The plaintiff informed the employers that he believed this termination was retaliatory and "threatened to report the alleged fraud to the government." *Id.* at 940.   In affirming the district court's judgment as a matter of law for the employers, the Seventh Circuit found that even though the plaintiff had used terms such as "illegal," "improper," and "fraudulent" in describing the billing practices at issue and even though he had contacted Medicare for more information regarding billing guidelines, he "was simply trying to convince the shareholders to comply with the Medicare billing regulations.  Such conduct is usually not protected by the FCA... [and] usually does not put an employer on notice of potential FCA litigation." *Id.* at 944-45.   His threat to report the defendants to the government took place after he was discharged, and his contact with Medicare officials was to get outside information to determine if billing practices were proper.   *Id.* at 944.   The Seventh Circuit found that

because it was part of the plaintiff's job to investigate billing reports and ensure compliance with Medicare regulations, nothing he did put his employers on notice that he was taking the "aggressive" steps of bringing suit against them or reporting them to the government. *Id.* at 945.

The Tenth Circuit, in *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1517 (10th Cir. 1996), came to a similar conclusion regarding an employee's persistent complaints to her employer that it was not complying with Medicaid claims submission requirements. There, a clinical director of a mental health facility frequently alerted her superiors that the facility was submitting and receiving payments for non-complying Medicaid claims and was eventually terminated. *Id.* The Tenth Circuit recognized that intra-office complaints could potentially serve as protected conduct under the FCA but found that even though the plaintiff had alerted her employer to its submission of non-complying claims, she "never suggested... that she intended to utilize such noncompliance in furtherance of an FCA action... [nor] that she was going to report such noncompliance to government officials." *Id.* at 1523. Because the plaintiff did nothing to indicate that she was doing anything other than what her position called for, her actions did not serve to put her employers on notice of the possibility of an FCA action, and thus did not qualify as protected conduct. *Id.*

16

The Sixth Circuit, citing extensively to Eleventh Circuit law, reached the same conclusions in *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 515-17 (6th Cir. 2000). There, a BellSouth employee claimed that she was harassed and suffered emotional breakdowns, eventually leading to her placement on permanent disability leave, after she reported fraudulent record-keeping on the part of BellSouth technicians and refused to submit false reports documenting fictitious records. *Id.* at 511-12. The Sixth Circuit found that "[a]lthough internal reporting may constitute protected activity, the internal reports must allege fraud on the government." *Id.* at 516. Although the plaintiff's conduct indicated some "awareness of consumer fraud, the... [FCA's] language requires more than just merely reporting wrongdoing to supervisors." *Id.* The court determined that the plaintiff's complaints primarily stemmed from the stress of having to falsify records and did not indicate any plan to launch an investigation into fraud on the government. *Id.* at 517. Because McKenzie's complaints were within the scope of her employment and because she did not engage in an investigation in furtherance of an FCA claim, her conduct was not protected under the FCA. *Id.*

These cases are as close to being directly on point with Ronk's circumstances as any case could be. She gave no indication to her employers that she was undertaking an investigation that would or might expose them to liability because of their submission

17

of false claims to the government, nor did she indicate that she was going to any law enforcement agency with her complaints. Although Ronk did make one mention of "fraud" to Brown, Narrows's accountant, in complaining that the doctors were not following the AMA-sanctioned billing guidelines, she otherwise did not inform the doctors - her only employers - that she believed their conduct to be fraudulent or illegal.  She spent a great deal of time with her employers reviewing the requirements for coding and billing and emphasizing the mandatory nature of following these requirements. She even strongly opposed Daugherty's move to a superbill system because she expressed the belief that it would result in improper coding and billing because she and the rest of the billing department would not have final oversight to ensure that the coding requirements were being complied with.  Even though Ronk did express her frustration and concern with Narrows's billing and coding processes to Brown, neither this nor any of the rest of her conduct lies outside the scope of her employment or suggests "whistleblowing."

As practice manager, she was responsible for enforcing compliance with coding guidelines and ensuring that all insurers - federal or otherwise - were properly billed.  She was also responsible for meeting with Narrows's accountants regarding proper billing practices.  None of Ronk's actions indicate that she was taking any action other than attempting to make her employers

18

comply with the rules.  Nothing she did could have reasonably put
her employers on notice that she was contemplating filing a qui tam
action or seeking government intervention.  Because Ronk's actions
indicate frustration with Narrows's failure to adhere to AMA
guidelines and an unwillingness to submit what she believed to be
fraudulent claims rather than a more "aggressive" move to seek an
outside investigation of fraud at Narrows, she did not alert her
employer to the distinct possibility of a qui tam suit and thus did
not engage in protected conduct under the FCA.  Because, as a
matter of law, no reasonable jury could find that Ronk engaged in
protected conduct, Narrows is entitled to a judgment as a matter of
law on her FCA retaliatory discharge claim.

### Denise Brunson

Narrows argues that there is no genuine issue of material fact
*vis-a-vis* Brunson because she, like Ronk, cannot fulfill the
elements of an FCA retaliatory discharge claim.  For the reasons
that follow, the court agrees with Narrows and finds that summary
judgment is due to be granted against Brunson.

Brunson claims, as she must, that she engaged in protected
conduct that put Narrows on notice of the possibility of an FCA
action and that, as a result, she was constructively discharged,
bringing her within the purview of the FCA's retaliatory discharge
provision.  To overcome Narrows's motion for summary judgment,
Brunson must first do what Ronk could not, namely, demonstrate that

19

she engaged in conduct protected by the FCA.  Brunson has a stronger case than Ronk in this regard because her conduct was qualitatively different than Ronk's.  On more than one occasion, Brunson told her employers directly that she believed that their billing and coding practices were "illegal" and "fraudulent." Whether such statements amount to protected conduct in this case, however, requires an intricate analysis.

In contrast to Ronk, Brunson was not terminated.  She contends that she was constructively discharged.  While not directly addressed by the Eleventh Circuit, other courts have allowed constructive discharge to serve as an adverse employment action within the meaning of the FCA's retaliatory discharge provision. *See, e.g., Neal v. Honeywell Inc.*, 191 F.3d 827, 830-31 (7th Cir. 1999) (finding that an employer's treatment of the plaintiff rose to the level of constructive discharge, thereby establishing enough evidence that the plaintiff's FCA retaliation claim could go to a jury).  However, even assuming that Brunson's conduct was protected under the FCA and, contrary to overwhelming authority, making the almost impossible conclusion that her job conditions were bad enough to establish constructive discharge, she is nevertheless unable to fulfill the third prong of an FCA retaliation claim.

Brunson alleges that she complained to her employers about their fraudulent coding and billing practices, and as a result, she was forced by mistreatment to resign and thus constructively

20

discharged.  However, Brunson claims that the employer's conduct that created a "constructive discharge" came in the form of her being forced to submit fraudulent and illegal claims to the United States government, for which she was exposed to liability because she was a certified coder.  In other words, Brunson claims that she was constructively discharged by being forced to engage in conduct that she had been tasked with prior to her engaging in her supposed "protected conduct."  This argument does not demonstrate the cause and effect relationship inherent in a retaliation claim.  In a retaliation claim, an employer takes "bad action" against an employee because the employee engaged in protected conduct.  In Brunson's case, Narrows did not alter its alleged mistreatment after she engaged in her alleged "protected conduct."  In the time between her strong criticism of Narrows's billing practices and her resignation, she did become certified as a professional coder and, for the purposes of summary judgment consideration, did become exposed to personal liability for any fraudulent claim she billed, but Narrows did not force this potential liability upon her. Brunson may argue that Narrows requiring her to engage in fraudulent billing practices amounted to constructive discharge, but because she had already been engaging in such practices before her alleged "protected conduct," she cannot logically be heard to argue that her constructive discharge came as a result of her "protected conduct."

21

Courts in the Eleventh Circuit and other courts across the country make clear that the causal relationship between protected conduct and retaliatory action is an essential element of an FCA retaliation claim. In *Mack*, the Eleventh Circuit required the plaintiff to show that his employer "retaliated against him *because of... [his] protected conduct*." *Mack*, 148 Fed. Appx. at 897 (emphasis added). In *Mann*, the Middle District of Alabama explicitly discussed this requirement, stating "[t]o prevail on a FCA claim, a plaintiff must also demonstrate a causal connection between her protected conduct and the allegedly retaliatory actions she suffered... to survive summary judgment, [plaintiff] must establish the existence of a genuine issue of material fact as to whether the negative treatment she suffered was motivated at least in part by retaliation for her protected conduct." *Mann*, 49 F. Supp. 2d at 1316. *See also Maturi*, 413 F.3d at 172 ("[T]o prevail on an FCA retaliation claim, a plaintiff must show that... the employer discharged or discriminated against him because of his protected conduct."); *Hutchins*, 253 F.3d at 188 ("[A] plaintiff must show his employer had knowledge of his 'protected conduct' and that the employer retaliated against him because of that conduct."); *McKenzie*, 219 F.3d at 518 ("The FCA's legislative history states that the employee must show that 'the retaliation was motivated at least in part by the employee's engaging in protected activity.'").

22

It is undisputed that Brunson was the head of the billing department, a position in which she oversaw what she believed to be the submission of fraudulent and illegal claims both before and after she engaged in what she characterizes as protected conduct. She does not allege that her job duties changed in any way after or as a result of her complaints. The only thing that did change was her certification as a professional coder which ostensibly exposed her to the possibility of personal liability that did not exist before. This exposure, which she claims made her job intolerable to the extent that she was constructively discharged, was not caused by Narrows. Narrows did not alter its treatment or mistreatment of Brunson subsequent to her complaints regarding its billing practice after she was certified, and thus Brunson cannot prove that Narrows had the requisite retaliatory intent. Alternatively, the court finds no evidence that working conditions were so intolerable as to turn a resignation into a constructive discharge. Consequently, there is no genuine issue of material fact, and Narrows is entitled to a judgment as a matter of law on Brunson's FCA retaliation claim.

***Motion to Strike***

In addition to moving for summary judgment on the retaliation claims, Narrows moves to strike various parts of the plaintiffs' evidentiary submission filed in support of their response to the motion for summary judgment. The vast majority of the evidence

23

that Narrows has moved to strike is related to the substantive question of whether any doctors at the Narrows actually engaged in fraudulent or illegal billing practices.  The evidence at issue is not relevant to determining whether the plaintiffs engaged in protected conduct, whether the doctors were aware of this protected conduct, whether adverse employment action was taken against the plaintiffs, or whether that adverse employment action had a causal connection to any protected conduct.  Any challenged evidence that may have some relevance to these issues is unnecessarily repetitive of other evidence already before the court.  Because it was unnecessary to consider any of the information referenced in the motion in reaching the court's decision on the motion for summary judgment, and because the disputed evidence would not strengthen plaintiffs' case on the merits even if it had been considered, Narrows's motion is rendered moot.

## CONCLUSION

Based on the foregoing, by separate order, Narrows's motion for summary judgment will be granted as to the claims of both plaintiffs.  Narrows's motion to strike will be declared moot.

**DONE** this 31st day of March, 2008.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

24